***********
Upon review of the competent evidence of record and the briefs and oral arguments of the parties, with reference to the errors assigned, and finding no good grounds to receive further evidence, or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms in part and reverses in part the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in their Pre-Trial Agreement and at the hearing as: *Page 2 
 STIPULATIONS
1. The parties are properly before the North Carolina Industrial Commission, and the North Carolina Industrial Commission has jurisdiction over the parties and the subject matter of these proceedings.
2. The parties are correctly designated, and there is no question as to the mis-joinder or the non-joinder of any party.
3. This matter is subject to the North Carolina Workers' Compensation Act.
4. An employment relationship existed between the parties, and Defendant-Carrier provided workers' compensation insurance coverage to Defendant-Employer on January 15, 2006, the date of Plaintiff's injury.
5. Plaintiff's average weekly wage at the time of the alleged work injury was $700.11, yielding a compensation rate of $466.76.
6. The parties stipulated to the following document being admitted into evidence as Stipulated Exhibit One — Pre-Trial Agreement.
7. The parties stipulated to the following documents being admitted into evidence as Stipulated Exhibit Two — North Carolina Industrial Commission forms and filings.
8. The parties stipulated to the following documents being admitted into evidence as Stipulated Exhibit Three — Plaintiff's medical records.
9. The parties stipulated to the following documents being admitted into evidence as Stipulated Exhibit Four — a compact disc containing a more complete set of Plaintiff's medical records. *Page 3 
10. The parties stipulated to the following document being admitted into evidence as Stipulated Exhibit Five — a "Memorandum of Agreement as to Attendant Care" dated February 15, 2008.
11. The parties stipulated to the following document being admitted into evidence as Stipulated Exhibit Six — a "Memorandum of Agreement as to Attendant Care" dated September 2, 2008.
12. The parties stipulated to the following documents being admitted into evidence as Stipulated Exhibit Seven — Plaintiff's updated medical records, received following the hearing before the Deputy Commissioner.
13. The parties stipulated to the following document being admitted into evidence as Stipulated Exhibit Eight — certified nursing assistant pay rates for Bayada Nurses.
14. The parties stipulated to the following document being admitted into evidence as Stipulated Exhibit Nine — "Occupational Therapy Evaluation to Access Plaintiff's Driving Abilities," received following the hearing before the Deputy Commissioner.
15. The parties stipulated to the following documents being admitted into evidence as Stipulated Exhibit 10 -Medical Rehabilitation Reports of Plaintiff, received following the hearing before the Full Commission.
16. The parties stipulated to the following documents being admitted into evidence as Stipulated Exhibit 11 — Additional Documentation including a March 29, 2010 "Stipulation" document, received following the hearing before the Full Commission.
17. The parties stipulated to the following documents being admitted into evidence as Plaintiff's Exhibit One — Plaintiff's North Carolina driver's license. *Page 4 
 *********** ISSUES
The issues to be determined are:
1. Whether Plaintiff is entitled to have Defendants provide a handicap-accessible van?
2. How many hours of home health/attendant care does Plaintiff require in a 24 hour period?
3. Whether Plaintiff's spouse is entitled to be paid home health/attendant care benefits, and if so, at what hourly rate for the hours of home health/attendant care that she provided to Plaintiff between August 19, 2008 and May 21, 2009?
4. Whether Plaintiff is permanently and totally disabled as a result of his January 14, 2006 work injury?
 ***********
Based upon the competent and credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on April 8, 1968 and is 42 years old. On January 14, 2006 Plaintiff was installing a vent on the roof of a building while working for Defendant-Employer when a piece of plywood blew up and struck him on his head, knocking him off the roof and resulting in multiple, serious injuries. Plaintiff's diagnoses as a result of his January 14, 2006 work injury included traumatic brain injury, diffuse intra-cranial contusions, left maxillary and orbital fractures, left mandibular condyle fracture, left C1 spinal fracture in the region of the vertebral artery with possible left vertebral arterial injury, and cerebellar ischemia. In addition, *Page 5 
Plaintiff also suffered cognitive and neurologic impairments including emotional lability, expressive dysphasia, altered smell/taste, and left hemiparesis.
2. Defendants admitted the compensability of Plaintiff's January 14, 2006 work injury via a Form 63 dated January 20, 2006 and an amended Form 63 dated January 24, 2006. Thereafter, Defendant provided the following medical treatment and other services to Plaintiff: medical care and rehabilitation for the three months following Plaintiff's January 14, 2006 work injury; attendant care in excess of the amount prescribed by Plaintiff's treating physician; Plaintiff's monthly rent; ongoing medical treatment, ongoing temporary total disability compensation; and medical devices including a motorized and a regular wheelchair, a four-prong cane, a hemi-walker, a lift recliner, a specialized bed, a tub bench, a three-in-one commode, and dressing aids. Upon Plaintiff's discharge from rehabilitation, Defendants provided home health services based upon a prescription written by Plaintiff's treating physician at the time, Dr. Flora McConnell Hammond, for five hours a day, seven days a week.
3. The attendant care initially prescribed by Dr. Hammond included care provided by certified nursing assistants (CNAs). CNAs provided Plaintiff with basic care, including assistance in activities of daily living such as bathing, grooming, dressing, toileting, light household chores, laundry and light meal preparation. CNAs also transported Plaintiff to his appointments and around town using Plaintiff's personal vehicle. CNAs are not able to provide any skilled nursing services such as pricking a finger in order to monitor blood sugar, or filling a client's pill container set.
4. Plaintiff and his wife, Mrs. Nellie Stowers, used the attendant care initially prescribed by Dr. Hammond over a three-month period from April 27, 2006 through July 26, 2006. After July 26, 2006, Plaintiff and Mrs. Stowers elected to cancel the attendant care, and *Page 6 
Mrs. Stowers provided for all of Plaintiff's activities of daily living. Mrs. Stowers does not have any training as a CNA or any training or experience in any medical or nursing field. Prior to caring for Plaintiff, Mrs. Stowers was a housewife, and she has an eighth grade education. Mrs. Stowers remained Plaintiff's sole caregiver over the next year.
5. Plaintiff's current treating physician is Dr. Otis Delano Curling, Jr., a neurosurgeon. On July 20, 2007, Dr. Curling opined that Plaintiff was at maximum medical improvement, and assigned a permanent partial disability rating of 60 percent to Plaintiff's whole person. In addition, Dr. Curling prescribed Plaintiff eight hours of attendant care.
6. On February 15, 2008, the parties entered into a written agreement whereby Defendants agreed to pay Mrs. Stowers for eight hours of daily attendant care at the rate of $8.50 per hour for the time period from July 27, 2006 through October 18, 2007. On September 2, 2008, the parties entered into a second written agreement concerning attendant care for Plaintiff whereby Defendants agreed to pay Mrs. Stowers for eight hours of daily attendant care at the rate of $9.00 per hour from October 19, 2007 through August 19, 2008. During this time period, Mrs. Stowers did not work outside the home.
7. As of August 19, 2008, Defendants began providing an in-home CNA for Plaintiff eight hours a day, seven days a week. Pursuant to the patient care plan setting forth the responsibilities of the CNAs hired by Defendants, Plaintiff was to receive the following attendant care from home health CNAs: grocery shopping as needed; preparation of breakfast, lunch, and snacks; assistance every other day with showering, transferring, and shampooing; accompanying Plaintiff to his medical appointments; setting up mouth care, which involves preparing the toothbrush for use; assisting with Plaintiff's daily shave; assisting with wheelchair-to-commode transfers; cleaning Plaintiff after toileting; assisting with ambulation by holding onto Plaintiff's *Page 7 
left arm; assisting with Plaintiff's physical therapy exercises; taking Plaintiff to outings such as to the local race track, auctions, or fair; doing Plaintiff's laundry; cleaning Plaintiff's bathroom and other areas of the house; changing linens once a week and as needed; and taking trash out as needed. The CNAs did not, however, provide any care during the night-time hours.
8. According to Mrs. Stowers, she provided attendant care to Plaintiff from August 19, 2008 through March 12, 2009 during the night-time hours when the home health CNAs hired by Defendants were not on duty. The attendant care duties that Mrs. Stowers provided for Plaintiff from August 19, 2008 to March 12, 2009 included: preparing dinner; administering medications; assisting with toileting, and assisting with dressing/undressing. Although Plaintiff requested a prescription for additional attendant care hours from Dr. Curling, he declined to do so, and actually decreased Plaintiff's attendant care hours due to his higher level of functioning.
9. From March 12, 2009 through April 21, 2009, Mrs. Stowers worked outside the home from 11:00 a.m. through 7:30 p.m. Occasionally, Mrs. Stowers would also work overtime, and would not come home until after 1:30 a.m. During these times, CNAs would remain with Plaintiff in order to provide him with assistance. Sometime after April 12, 2009, Mrs. Stowers quit her job and indicated her intent to end her marriage with Plaintiff. CNAs continued to work with Plaintiff until Mrs. Stowers moved out on May 19, 2009. Thereafter, Defendants instituted 24 hour care in order to assist Plaintiff with the transition resulting from his wife being gone until August 1, 2009.
10. Plaintiff is currently independent in the majority of his activities of daily living, and requires assistance mainly for transfer to/from the commode, to/from the shower, and with ambulation, although he does have good balance. Plaintiff can shave, bathe, and dress himself, including buttoning and zipping his clothing. Plaintiff can also administer and take his own *Page 8 
medications independently, and is able to do his own mouth care, including brushing his teeth, rinsing his mouth, throwing away items, and helping to put away items. As of April 30, 2009, the type of care that Plaintiff needed was primarily "companionship," meal set-up, and assistance with hygiene activities. Otherwise, Plaintiff is able to do most things for himself.
11. On June 19, 2009, Dr. Curling recommended that Plaintiff receive one hour of attendant care every four hours, which equals six hours of attendant care per day. Dr. Curling was of the opinion that Plaintiff is able to function well with intermittent attendant care being provided an hour at a time, several times a day, and does not need care 24 hours a day, seven days a week. Dr. Curling opined that it was appropriate for Plaintiff to be at home without attendant care for an average of four hours between care intervals, and that the use of an adult diaper for six to eight hours per night was also acceptable in order to help Plaintiff manage bathroom and elimination needs when attendant care was not available. It was Dr. Curling's opinion that there is no medical reason why Plaintiff cannot be alone in the home, and that he would benefit tremendously in his independence by living at home with intermittent attendant care versus living in an assisted care facility. After August 1, 2009, Defendants instituted Dr. Curling's recommendations regarding attendant care for Plaintiff.
12. Several of Plaintiff's health care providers other than Dr. Curling gave deposition testimony concerning his need for attendant care, including Ms. Caitlyn Renee Lichtenhahn, Ms. Kathy Stewart Stratton, Ms. Sherry Musten Sisk, and Ms. Janet Groce. Ms. Lichtenhahn and Ms. Stratton are CNAs who provide direct care to Plaintiff on a regular basis. Ms. Sisk is the clinical nurse manager who developed Plaintiff's patient care plan for his attendant care needs and oversees the work of Ms. Lichtenhahn, Ms. Stratton, and any other CNA who provides direct care to Plaintiff. Ms. Groce is Plaintiff's clinical/nurse case manager who has been working with *Page 9 
him since his initial hospital discharge in 2006. Ms. Lichtenhahn, who provided care to Plaintiff for just a few months, stated that Plaintiff's need for assistance is unpredictable. Ms. Stratton, who has been providing care for Plaintiff since September 1, 2008, felt that his overall condition is unchanged, and that he required assistance with almost "everything." Ms. Sisk was of the opinion that Plaintiff required continuous monitoring and assistance with personal care, transferring, and walking. Ms. Groce opined that Plaintiff requires eight hours of attendant care per day, and that although he does not need someone with him constantly, he needs someone present for safety reasons for transfers and visits to the bathroom, and he does better with a companion in order to keep him company.
13. The Full Commission gives greater weight to Dr. Curling's opinions regarding Plaintiff's attendant care needs over any contrary opinions provided by Ms. Lichtenhahn, Ms. Stratton, Ms. Sisk, and Ms. Groce. Although Plaintiff's direct caregivers and case managers see him on a more frequent basis, their educational and clinical training and experience render them less qualified to render medical opinions as to Plaintiff's hourly needs than Dr. Curling, who is Plaintiff's treating physician. In addition, Dr. Curling is in a better position to render objective opinions regarding Plaintiff's attendant care needs based upon clinical and medical criteria.
14. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff's wife is entitled to retroactive attendant care for one hour per day, seven days per week, at a rate of $9.00 per hour for the period from August 19, 2008 through May 21, 2009 when she provided night-time care to Plaintiff.
15. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff is entitled to six hours of attendant care services daily, consisting of one hour of attendant care every four hours. The nighttime care included in Dr. Curling's recommendation is *Page 10 
necessary to prepare Plaintiff for bedtime and the overnight hours. The parties may elect by agreement to structure the care differently due to availability of caregivers, but early morning and bedtime care must be provided; however, the Full Commission accepts the March 29, 2010 Stipulations of the parties as sufficient compliance as long as Plaintiff's current living arrangements remain the same.
16. As a result of Plaintiff's January 14, 2006 work injury, he is unable to operate a non-modified vehicle. Thus, Defendants provide a transportation company to take Plaintiff to and from his medical appointments. In August 2007, Ms. Cindy Crompton performed a vehicle modification assessment and an occupational therapy evaluation to assess Plaintiff's driving abilities. The occupational therapy evaluation concluded that Plaintiff is able to drive a vehicle modified to meet his particular physical limitations, and the vehicle modification assessment concluded that neither of Plaintiff's current vehicles, a 2005 Dodge Caravan and an older pickup truck, is suitable for modification due to mileage.
17. The Full Commission finds, based upon the greater weight of the evidence, that a vehicle modified to accommodate Plaintiff's physical limitations is reasonably required to lessen his disability. A handicap accessible vehicle would allow greater mobility for Plaintiff, increase his overall quality of life and is uniquely necessary in order to accommodate his disability. Although Plaintiff's 2005 Dodge Caravan is not ideally suited for modification due to the mileage, the evidence does not establish that it is not possible to modify this vehicle. Since Defendants are not required to purchase a new van for Plaintiff and Plaintiff is not required to purchase a new van in order to have his vehicle modified, the Full Commission finds that Defendants are obligated to modify the 2005 Dodge Caravan that Plaintiff already owns *Page 11 
immediately, or work out a suitable arrangement with Plaintiff that would allow him to obtain a van where modifications to make it handicap accessible would be cost effective.
18. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff is significantly impaired with respect to his ability to return to gainful employment, particularly due to his cognitive and mobility deficits. Plaintiff also has persistent emotional lability and difficulties with higher cortical functioning. Plaintiff is physically limited to light activities, with permanent restrictions including a 20 pound maximum lifting restriction, no working at heights or in a position that requires fine balance, no prolonged ambulation, and no ambulation on uneven surfaces. As a result of Plaintiff's cognitive deficits, he is not able to perform activities that require significant use of higher cortical functioning such as calculation, memory retention, and judgment. Prior to Plaintiff's January 14, 2006 work injury, he worked for Defendant-Employer as a welder/iron worker. Plaintiff is not able to return to this employment.
20. The Full Commission finds that due to his physical and mental limitations Plaintiff is incapable of working in any employment.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Where the expense of an item is an "ordinary necessity of life," the cost of the expense is to be paid from the statutory substitute for wages provided by the North Carolina Workers' Compensation Act. Timmons v. N.C. Dept. of Transp.,123 N.C. App. 456, 461-462, 473 S.E.2d 356, 359 (1996), aff'd. percurium, 346 N.C. 173, 484 S.E.2d 551 (1997). *Page 12 
Transportation, including the purchase of a van, is an ordinary expense of life. Compensable vehicle modifications are limited to those aspects which are not ordinary necessities, but are uniquely necessary in order to accommodate the Plaintiff's disability. Defendant-Employer is only required to pay for adaptive equipment necessary to modify a van in order to accommodate Plaintiff's disabilities related to his January 14, 2006 work injury.Timmons,123 N.C. App. 456, 461-462, 473 S.E.2d 356, 359 (1996), aff'd. percurium, 346 N.C. 173, 484 S.E.2d 551 (1997). "Other treatment or care" and "rehabilitation services" refer only to "services or treatment, rather then tangible, non-medically related items such as a van." McDonald v. Brunswick Electric Membership Corp.,77 N.C. App. 753, 756-57, 336 S.E.2d 407, 408-09 (1985).
2. A vehicle modified to accommodate Plaintiff's physical limitations is reasonably required to lessen his disability. A handicap accessible vehicle would allow greater mobility for Plaintiff, increase his overall quality of life and is uniquely necessary in order to accommodate his disability. As a result of Plaintiff's January 14, 2006 work injury, Plaintiff is entitled to have Defendants pay for any and all modifications necessary in order to allow Plaintiff to utilize his own private transportation via a van modified to meet his particular physical limitations. Plaintiff is responsible for any new or used van purchase. Plaintiff may elect to have Defendants undertake modifications on his 2005 Dodge Caravan, or Plaintiff may purchase a new or used van, and Defendants must then pay the difference between the van price and the modification price. N.C. Gen. Stat. § 97-2(19) (2009);McDonald,77 N.C. App. 753, 756-57, 336 S.E.2d 407, 408-09 (1985);Dereby v. Pitt County Fire Marshall, 318 N.C. 192 (1986).
3. Plaintiff's wife is entitled to retroactive attendant care for one hour per day at a rate of $9.00 per hour for the period from August 19, 2008 through May 21, 2009 in which she provided night-time care to Plaintiff. N.C. Gen. Stat. § 97-25 (2009).Godwin v. Swift and Co., 270 N.C. 690, 155 S.E.2d 157 (1967); *Page 13 London v. Snak Time Catering, Inc.,136 N.C. App. 473, 525 S.E.2d 200 (2000).
4. Plaintiff is entitled to six hours of attendant care services daily, including night care, in order to prepare him for bedtime and the overnight hours. The parties may elect by agreement to structure the care differently due to availability of caregivers, but early morning and bedtime care must be provided; however, the Full Commission accepts the March 29, 2010 "Stipulation" of the parties as sufficient compliance as long as Plaintiff's current living arrangements remain the same. N.C. Gen. Stat. §§ 97-2(19), 97-25 (2009); Godwin,270 N.C. 690, 155 S.E.2d 157 (1967); London,136 N.C. App. 473, 525 S.E.2d 200 (2000).
5. As a consequence of Plaintiff's January 14, 2006 work injury, he is incapable of working in any employment due to his physical and mental limitations. Russell v. Lowe's Prod. Distrib.,108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, Defendants shall pay to Plaintiff continuing total disability compensation at the rate of $466.76 per week until further order of the Industrial Commission.
2. Defendants shall pay all medical expenses incurred as a result of Plaintiff's January 14, 2006 work injury, for so long as such evaluations, examinations, and treatments may reasonably be required to effect a cure, to give relief, and/or to lessen his period of disability, in accordance with the provisions of the North Carolina Workers' Compensation Act. *Page 14 
3. Plaintiff's request for Defendants to purchase a modified van is DENIED. However, Defendants shall pay for any and all modifications necessary in order to allow Plaintiff to utilize his own private transportation via a van modified to meet his particular physical limitations. Plaintiff may elect to have Defendants undertake modifications on his 2005 Dodge Caravan, or Plaintiff may purchase a new or used van, and Defendants must then pay the difference between the van price and the modification price.
4. Defendants shall pay Plaintiff's wife retroactive attendant care for one hour per day at a rate of $9.00 per hour for the period from August 19, 2008 through May 21, 2009 in which she provided nighttime care to Plaintiff.
5. Defendants shall provide to Plaintiff six hours of attendant care services daily, including night care, in order to prepare him for bedtime and the overnight hours, unless the parties agree in writing to a different arrangement.
6. A reasonable attorney's fee of 25 percent is hereby approved for Plaintiff's counsel. Defendants shall deduct and pay directly to Plaintiff's counsel 25 percent of any accrued compensation owed to Plaintiff and every fourth compensation check thereafter.
7. Defendants shall pay the costs of these proceedings.
This the ___ day of June 2010.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 1